No. 14-960C
(Judge Horn)

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LW CONSTRUCTION OF
CHARLESTON, LLC

Plaintiff,

v.

UNITED STATES,

Defendant.

## DEFENDANT'S REPLY IN SUPPORT OF OUR
## MOTION FOR LEAVE TO FILE AMENDED ANSWER WITH COUNTERCLAIM

CHAD R. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:                    MARTIN F.HOCKEY, JR.
                               Deputy Director
EYVONNE MALLET
Attorney                       JEFFREY M. LOWRY
Office of General Counsel      Trial Attorney
Department of Veterans Affairs ERIN K. MURDOCK-PARK
                               Trial Attorney
                               Commercial Litigation Branch
                               Civil Division
                               U.S. Department of Justice
                               P.O. Box 480
                               Ben Franklin Station
                               Washington, DC 20044
                               Telephone:  (202) 616-3753
                               Facsimile:   (202) 514-8624

December 20, 2017             Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. i

STATEMENT OF FACTS IN SUPPORT OF REPLY ............................................3

    I.       Statutory Background ............................................................3

    II.     LW's Proposal, 2009 CVE Application, And The 2011 CVE Investigation..........5

    III.    Landmark's Qui Tam Litigation ..........................................7

    IV.    Defendant's Decision To Seek Leave To Amend The Answer ...........................8

ARGUMENT ......................................................................................................11

    I.       Permitting The Filing Of Our Defense and Counterclaims Would Not Cause Undue Delay Or Prejudice ..................................................11

    II.     The Government's Fraud Defense And Counterclaims Are Facially Valid ..........15

         A.    The Statute Of Limitations Would Not Bar Our Fraud Defense Or Counterclaims ..................................................15

         B.    LW's Fraudulent Representations As To Its SDVOSB Eligibility Are Clearly Material To Claims For Payment Under That Contract ...............20

    III.    Seeking To Prevent Payment To A Contract Obtained By Fraud Is Not An Improper Purpose For Requesting Leave To Amend Our Answer .......................24

CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Alaska v. United States*,
   15 Cl. Ct. 276 (1988) ............................................................................................ 12

*American Heritage Bancorp v. United States*,
   56 Fed. Cl. 596 (2003) ........................................................................................... 17

*Brown v. United States*,
   207 Ct. Cl. 768 (1975) ........................................................................................... 19

*Centcast Services, L.P. v. United States*,
   729 F.3d 1352 (Fed. Cir. 2013) .............................................................................. 12

*Datascope Corp. v. SMEC, Inc.*,
   962 F.2d 1043 (Fed. Cir. 1992) .............................................................................. 11

*Erie Basin Metal Prods., Inc. v. United States*,
   150 F.Supp. 561 (Ct. Cl. 1957) .............................................................................. 17

*First Fed. Sav. Bank of Hegewisch v. United States*,
   52 Fed. Cl. 774 (2002) ........................................................................................... 17

*Foman v. Davis*,
   371 U.S. 178 (1962) ............................................................................................... 12

*J.E.T.S., Inc. v. United States*,
   838 F.2d 1196 (Fed. Cir. 1988) .............................................................................. 22

*Jana Inc. v. United States*,
   34 Fed. Cl. 447 (1995) ........................................................................................... 18

*Rockwell Automation, Inc. v United States*,
   70 Fed. Cl. 114 (2006) ........................................................................................... 12

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
   131 S. Ct. 1885 (2011) ........................................................................................... 19

*Strand v. United States*,
   No. 16-2450, 2017 U.S. App. LEXIS 17265 (Fed. Cir. Sept. 7, 2017) ............................. 16, 17

*United States ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943) ......................................................................................... 19, 23

*United States v. Anchor Mortg. Corp.*,
711 F.3d 745 (7th Cir. 2013) ......................................................................... 19

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
*(Escobar)*, 136 S. Ct. 1989 (2016) .......................................................... passim

*Veridyne Corp. v. United States*,
86 Fed. Cl. 668 (2009) .................................................................................... 15

*Veridyne Corp. v. United States*,
758 F.3d 1371 (Fed. Cir. 2014).................................................................. 18, 19

## Statutes

15 U.S.C. § 632 .......................................................................................... 5, 22

15 U.S.C. § 657 .......................................................................................... 5, 22

28 U.S.C. § 2415 .................................................................................. 15, 16, 17

31 U.S.C. § 3729 ...................................................................................... passim

31 U.S.C. § 3731 .................................................................................. 15, 18, 19

38 U.S.C. § 8127 ............................................................................................. 3

Veterans Benefit, Healthcare, and Information Act of 2006,
Pub. L. No. 109-461, 120 Stat 3403 (2006)....................................................... 3

Veterans Small Buiness Verification Act of 2010,
Pub. L. No. 111-274 § 104, 124 Stat 2864 (2010)........................................... 4

## Regulations

13 C.F.R. § 125.18 ......................................................................................... 23

13 C.F.R. § 125.32 ......................................................................................... 22

## Other Authorities

VA Veteran-Owned Small Business Verification Guidelines,
73 Fed. Reg. 29,024-01 (May 19, 2008)........................................................... 4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LW CONSTRUCTION OF CHARLESTON, LLC | ) ) ) | |
| Plaintiff, | ) ) | No. 14-960C (Judge Horn) |
| v. | ) ) ) | |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF OUR
<u>MOTION FOR LEAVE TO FILE AMENDED ANSWER WITH COUNTERCLAIM</u>**

In our motion for leave, we requested leave of the Court to amend our answer and permit the Government to assert counterclaims and defenses based on fraud. Specifically, we sought to bring counterclaims which allege that the plaintiff, LW Construction of Charleston, LLC (LW), misrepresented its status as a service-disabled veteran-owned small business (SDVOSB) in order to receive an award for the construction project at Fort Jackson National Cemetery, an award reserved for legitimate SDVOSBs. Based on this allegation, we sought to amend our answer to add counterclaims and defenses under the False Claims Act (FCA) and a theory of common law fraud and unjust enrichment. In response to our motion for leave, LW asserts that the Court should deny our request for leave because the request is untimely, improper, prejudicial, and otherwise futile. The Court, in its November 27, 2017 status conference, directed the Government to include in its reply brief a more detailed timeline of events surrounding the Government's fraud investigation.

As we demonstrate below, the Government should be permitted leave to seek discovery and establish that LW Construction's contract with the Government was illegally obtained for the

purpose of providing benefits to Brantley Construction, a large non-SDVOSB construction firm, and its principals, Sidney and Gary Brantley.

First, leave to amend our complaint should be granted because the Government timely investigated and pursued its fraud claims and defenses in response to LW's claims once we became aware during discovery of the extent of the fraudulent behavior, to include that Louis White, the service-disabled veteran, never fully owned or controlled LW.

Second, any delay by the Government in bringing its claims is not prejudicial to LW when LW possesses all of the information necessary to either prove or rebut the Government's claims that LW misrepresented its status to receive the contract award.

Third, the Government's counterclaims and defenses would not be futile. The Court's six-year statute of limitations does not limit the Government's ability to assert common law fraud claims and defenses. Similarly, the False Claims Act (FCA) statute of limitations does not bar the Government from bringing its claims—at a minimum, the Government can assert FCA claims going back six years, to October 13, 2011. In addition, LW's materiality arguments must necessarily fail because the existence of a legal contract is a material condition to payment under that contract, as well as this Court's jurisdiction, the Department of Veterans Affairs (VA) stopped paying LW for performance reasons despite the contracting officer not being aware of the fraudulent award, and the fraudulent inducement of a contract award would negate LW's ability to make such equitable estoppel arguments.

Finally, LW's bald assertion that our proposed amendment is improper and for the purpose of delaying trial or forcing a favorable settlement is unfounded. The Government is seeking leave to amend its complaint because a large construction company should not be permitted to both

deprive legitimate SDVOSBs of opportunities, and then profit again from filing claims against the Government after failing to perform on its illegally obtained contract.

**STATEMENT OF FACTS IN SUPPORT OF REPLY**

I.     Statutory Background

On December 26, 2006, Congress passed the Veterans Benefits, Healthcare, and Information Act of 2006 (Veterans Benefits Act of 2006), Pub. L. No. 109-461, 120 Stat 3403 (2006). Section 502 of the Veterans Benefits Act of 2006, codified as amended at 38 U.S.C. § 8127 (2012), created a new mandate for the VA to set-aside competitive procurements for veteran-owned and service-disabled veteran-owned small businesses if two or more such businesses were likely to compete for a particular contract award.  In order to implement this program, section 502 also required the VA to maintain a database of eligible veteran and service-disabled veteran, owned and controlled small businesses.  *See* 38 U.S.C. § 8127(f).  The VA database of SDVOSBs and veteran-owned businesses is known as the VetBiz Vendor Information Pages (VIP).  The Government Accountability Office (GAO) found that, as of March 2009, almost 16,500 companies had self-certified as either SDVOSBs or veteran-owned small businesses on VIP.  *See* Ex. 1; GAO-09-391R, Department of Veterans Affairs Contracting with Veteran Owned-Small Businesses, at 3 (March 19, 2009) (hereinafter "GAO Report") (available at https://www.gao.gov/products/GAO-09-391R).

After the passage of the Veterans Benefits Act of 2006, the VA issued new guidance concerning eligibility for the SDVOSB program.  Pursuant to its June 19, 2007 Information Letter, the VA required vendors to register in VIP before contract award to be eligible for the award of a VA SDVOSB contract.  Ex. 2; U.S. Dep't of Veterans Affairs, IL 049-07-08, Veterans First Contracting Program (2007).   Contractors were not required to register at the time

they submitted offers. *Id.* at 5. Contracting officers were only required to make sure vendors were registered in VIP to determine eligibility for a particular award. *Id.* at 4-5.

On May 19, 2008, the VA issued interim regulations to revise the process for verifying SDVOSBs were legitimate in response to concerns about misrepresentation through the self-certification process. VA Veteran-Owned Small Business Verification Guidelines, 73 Fed. Reg. 29,024-01 (May 19, 2008). Vendors would be required to both register on VIP and submit "information establishing that the business is owned and controlled by eligible parties . . . ." *Id.* at 29,024. The VA would then review the information and vendors would receive a "verified" status. *Id.* However, because of the large number of vendors registered on VIP, verification examinations only occurred by request of the vendor, and VA policy permitted contracting officers to award SDVOSB contracts to vendors who were only registered on VIP. GAO Report, Ex. 1 at 4. As the GAO found in 2009, of the nearly 16,500 firms registered in VIP, the VA had only verified 484 firms. *Id.* at 24.

After the GAO began reporting on abuse of the SDVOSB program, including from awarding contracts to large businesses that misrepresented their status at the expense of legitimate SDVOSBs, Congress enacted the Veterans Small Business Verification Act of 2010, Pub. L. No. 111-275, § 104, 124 Stat 2864, 2867 (2010). The act required vendors to submit documentation to the VA's Center for Veterans Enterprise (CVE)[1] supporting eligibility for the SDVOSB program within 90 days of receiving notice, or else be removed from the VIP database. *Id.* Only

---

[1] CVE was later retitled the Center for Verification and Evaluation.

upon approval of the VA that their status was verified status would a vendor be included on the database thereafter.[2]

II.    LW's Proposal, 2009 CVE Application, and the 2011 CVE Investigation

On March 31, 2009, the VA issued its solicitation for the Fort Jackson National Cemetery project.  The solicitation limited award to SDVOSBs and required offerors to be registered in both the Central Contractor Registration (CCR) database and VIP prior to award and to certify that they were eligible SDVOSBs.  ECF 61-1 at 74.

On April 29, 2009, LW submitted its proposal for the Fort Jackson National Cemetery contract.  Before the contract was awarded, the contracting officer performed a responsibility determination to establish, among other requirements, that LW was registered and certified in both CCR and VIP as an eligible SDVOSB.  Ex 3, Decl. of Robert Capers at ¶ 3.  The contracting officer relied on LW's representations that it was an eligible SDVOSB when making the award.  *Id.* at ¶ 4.  Before the contract was awarded, LW did not inform the contracting officer that it was, in fact, not an eligible SDVOSB.  *Id.* at ¶ 7.  LW did not disclose to the VA that its operating agreement restricted Mr. White's ownership rights and his ability to control the critical functions of the company.  *Id.* at ¶ 5. The VA relied on LW to review the requirements for ownership and control and accurately certify that it met those requirements, as permitted by the regulations at that time.  *See id.* at ¶ 4.

---

[2]  It should be noted that since 2003 (and before the passage of the Veterans Benefits Act of 2006), the Small Business Administration (SBA) has administered a separate SDVOSB contracting preference program pursuant to the authority provided by 15 U.S.C. § 657f.  SBA determined that SDVOSBs should only have to self-certify themselves as eligible rather than submit information to demonstrate eligibility.  70 Fed. Reg. 14523, 14524 (March 23, 2005) (discussion by SBA in preamble to SBA SDVOSB regulation).  Companies submit certifications by entering information into the Online Representations and Certifications Application database. *See* 15 U.S.C. § 632(x); 48 C.F.R. §§ 4.1201, 52.219-1.

Even after the June 2, 2009 contract award, when LW first applied for "verified" SDVOSB status with the Center for Veteran's Enterprise, LW did not disclose its operating agreement or its affiliated businesses to the VA.[3]  *See* Ex. 4, Decl. of Benjamin Ward at ¶ 5.  The only information LW submitted to CVE was Mr. White's percentage of ownership interest in the company and a statement certifying that Mr. White had ownership and control of the company, which he did not.  *Id.*

After falsely certifying its SDVOSB eligibility at the outset, LW continued to conceal information regarding Mr. White's ownership and control until July 29, 2011, when it was forced to provide the information by CVE.  *See* Ex. 4 at 8.  After reviewing LW's operating agreement and other financial information, as well as conducting an onsite investigation, CVE denied LW's request for continued inclusion in the VIP database as a verified SDVOSB.  Ex. 5.  LW requested reconsideration of this decision, but CVE denied the request on March 1, 2012.  Ex. 6.

By February 22, 2012, the VA had stopped approving payment requests from LW – but this was not because of a determination regarding SDVOSB status; instead, VA ceased payments because of LW's failure to meet the contract's scheduling requirements.  *See* ECF No. 22-1, Am. Compl. Ex. A at 5.  In addition, LW had already invoiced for over 90 percent of the work, but much of that work proved defective or required repair.  Although the VA contracting staff

---

[3]  Although LW asserts in its response brief that LW completed the "VA's on-line self-certification application . . . ," in early 2009 and was notified that it was a "verified" SDVOSB by January 14, 2009, the documents suggest otherwise.  While LW may have registered in VIP before submitting its proposal, it did not register in CCR until March 30, 2009, did not complete its Online Representations and Certifications Application until May 22, 2009, and did not complete its application for verified SDVOSB status with the VA until August 25, 2009.  Although LW points to a letter with an alleged date of January 14, 2009, the VA did not approve LW as a "verified" SDVOSB until January 14, 2010.  In January 2010, the VA verified SDVOSBs by confirming that a service-disabled veteran had a 51 percent ownership interest in the business when it relied on the representations of the business that it was "owned and controlled" by the veteran as required by the Veterans Benefit Act of 2006.

assigned to the Fort Jackson project learned that LW had subsequently lost its SDVOSB status several years after the award of the contract, they did not believe a contractor's subsequent loss of SDVOSB status had any effect on a contract awarded in 2009. *See* ECF No. 68-23, LW Resp. to Mot. for Leave Ex. 23 (Pl. Resp.). However, when Susan Lam, a contracting officer newly assigned to the project in June of 2012, began to suspect that LW was a front company for Brantley Construction in late 2012, she referred the matter to the VA Inspector General. Ex. 7, Decl. of Susan Lam. Despite her referral and despite following up with the Inspector General's office prior to termination, Ms. Lam did not receive any indication that LW was under review for fraud before the contract was terminated in 2013 for performance reasons. *Id.*; *see also* Pl. Resp. Ex. 22.

III.    Landmark's Qui Tam Litigation

On October 16, 2013, LW's contract was terminated for default. By that time, or soon thereafter, LW had no other contracts with the VA, had not challenged its loss of SDVOSB status, and was seeking no additional SDVOSB work. In February of 2014, Landmark Construction filed suit against LW in district court for allegedly unpaid work it performed as a subcontractor on the Fort Jackson project. Ex. 8. In addition, the principals of Landmark, Frederick and Cynthia Mixson, filed a seperate qui tam action under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, against LW alleging that LW violated the FCA by misrepresenting its status as an SDVOSB when, in fact, it was effectively owned and controlled by Sidney and Gary Brantley. Pl. Resp. Ex. 26.

In response to the *qui tam* suit, the United States Attorney's Office for the District of South Carolina conducted an investigation concerning the relators' allegations. Among other things, the U.S. Attorney's Office, along with the VA OIG, reviewed the SDVOSB documents

maintained by CVE and interviewed the relators.  In addition, investigators from the VA OIG and the Department of Defense Office of Inspector General interviewed Mr. White.  Ultimately the U.S. Attorney's Office declined to intervene in the qui tam action, which allowed the realtors the opportunity to pursue the claims on their own.  Ex. 9.

IV.    Defendant's Decision To Seek Leave To Amend The Answer

After the U.S. Attorney's Office declined to intervene in the qui tam action, LW Construction filed suit in this case challenging the VA's decision to terminate it for default.  ECF No. 1.  In their January 26, 2015 status report, the parties advised the court of the qui tam action and a criminal investigation into LW's SDVOSB misrepresentations.  ECF No. 10.  In that same January 2015 report, LW advised the Court that it intended to file a claim with the VA.  ECF No. 10.  That claim was submitted to the VA on February 17, 2015.  *See* ECF No. 22-2 at 1.  Although the Government was aware of the fraud allegations, because the allegations were being raised by a disgruntled subcontractor, the Civil Division declined to intervene in the qui tam case, and no criminal charges were filed, the issue of fraud did not appear sufficiently meritorious at that time to warrant dedicating significant resources; instead the focus was on addressing LW's extensive and newly filed claim, with the matter effectively remanded to the VA for a decision.  On June 16, 2015, the Court granted the parties stay of proceedings while the VA reviewed the claim and issued a final decision.  ECF No. 12.

On August 17, 2015, the qui tam action was dismissed without prejudice to the United States after LW and Landmark settled the subcontract payment dispute.  *See* Ex. 10.  In addition, no criminal charges were filed by that date.[4]

---

[4]  There is no longer an active criminal investigation.

LW submitted to the VA a revised certified claim on September 15, 2015 and a second claim on September 24, 2015.  ECF Nos. 22-2, 22-4.  On October 29 and November 13, 2015, respectively, the contracting officer denied the claims.  ECF Nos. 22-3, 22-5.

In November 2015, counsel for the Government conferred with the United States Attorney's Office regarding the Government's decision to decline to intervene in the *qui tam action*.  Based on that discussion, given the decision by the U.S. Attorney's Office not to intervene in the *qui tam* action, or file charges in the criminal case, there did not appear to be any reason for the Government's counsel in this case to raise a fraud defense or to pursue a fraud counterclaim.

From November 2015 through November 2016, document discovery continued in this case. Depositions began in Columbia, South Carolina during the week of November 14, 2016.  As we noted in our motion, counsel for LW insisted on the attendance of Gary Brantley at the depositions.  ECF No. 61 at 8.  At the time, the Government was not aware that Gary Brantley no longer had any ownership interest in LW and that Sidney Brantley owned 98 percent of the company.  After attending the first deposition taken by LW, on November 15, 2016, and meeting Louis White and Gary Brantley, counsel for the Government began to suspect that it was more likely than not that the Brantleys exercised control over both the ultimate decision making of LW as well as Mr. White.  That same day, the Government renewed its investigation into LW's SDVOSB status.

On March 16, 2017, we issued discovery requests to LW seeking documents related to its SDVOSB status.  Ex. 11.  Then, on March 23, 2017 we received documents from the VA's Center for Verification and Evaluation (previously known as the Center for Veterans Enterprise) related to CVE's denial of LW's SDVOSB status in 2011.  After reviewing CVE's investigation results and its decision, it became apparent that not only did LW not qualify for SDVOSB status

in 2011 – the sole issue CVE was examining – LW was not a legitimate SDVOSB when it bid on

the Fort Jackson contract. We later obtained documents in March 2017 from CVE and VA OIG,

organizations not involved in the administration of the contract, that established that the idea for

the formation of LW was proposed by the Brantleys, that Louis White did not put any significant

amount of money into the company, that LW was operated out of the same building as Brantley

Construction, that Brantley Construction employees identified the work LW was to bid on, and

that Louis White had lied to CVE investigators when he told them in 2011 that each of the

principals of the company had put $250,000 into the company.

On April 17, 2017, LW responded to our discovery request by refusing to provide documents

related to its SDVOSB status, with the exception of its proposal. Ex. 12. After receiving LW's

response, we began the process to obtain authority for the fraud counterclaim within the

Department of Justice, which required the coordination with and approval from multiple sections

of the Department. Although the issue of fraud was clear, the coordination with various

branches within the Department of Justice's Civil Division required more time than anticipated

as we internally deliberated a variety of issues related to this case.

At the same time, and because of pending deadlines in fact discovery, we proceeded with

depositions of LW's witnesses from July through September 2017. During the course of

depositions we continued to learn information that demonstrated fraud. We learned from the

deposition of Christina McIlhaney, an employee of Brantley Construction, that Brantley

Construction employees were seeking business opportunities and assembling bids for LW, and

that Sidney Brantley made the ultimate decision regarding whether Brantley Construction or LW

would bid on the project. Although the depositions of Gary Brantley, Sidney Brantley, and

Louis White were inconsistent regarding certain facts, we learned through those depositions that

LW was funded entirely through loans provided by Brantley-affiliated firms that were passed off as personal loans from the owners.  We also learned that Brantley employees eventually took over completion of the Fort Jackson contract without any formal subcontract or notice to the VA. Finally, among other items referenced in our motion for leave, we learned that Sidney Brantley currently owns 98 percent of LW, purchased from Mr. White for "a couple dollars."

On September 19, 2017 we received authority to file fraud counterclaims and defenses. Based upon this authority, and the increasing evidence that LW is not now and never was owned or controlled by Louis White, we moved for leave to amend our answer.

<u>ARGUMENT</u>

I.    Permitting The Filing Of Our Defense And
      <u>Counterclaims Would Not Cause Undue Delay Or Prejudice</u>

As we demonstrated in our motion for leave, LW could not show undue delay or prejudice to warrant denial of our motion.  In response, LW argues that our delay was excessive and unwarranted, as well as prejudicial because of the need for additional discovery and an increased complexity to the litigation.  *See* Pl. Resp. 15-18.  LW is incorrect.

First, it is rather unusual that a contractor seeking money from the Government based on a fraudulently obtained contract would assert a prejudice defense based upon our delay in pursuing the issue.  It is true that at various times during the litigation of this case, counsel engaged in deliberate study of the issue of fraud.  But through our discovery, it would be evident to the reasonable observer that we were pursuing a line of inquiry that might lead to fraud-based counterclaims and defenses.  Ultimately, the counterclaims and defenses are premised upon the improper actions of the plaintiff.  There can be no prejudice here.

In any event, delay may warrant denial of a motion for leave, but such delay must be undue. *Datascope Corp. v. SMEC, Inc.*, 962 F.2d 1043, 1034 (Fed. Cir. 1992) (quoting *Foman v. Davis*,

371 U.S. 178 371 U.S. at 182).  Such a delay must be excessive and, as LW recognizes, such delay is often measured in years.  *Alaska v. United States*, 15 Cl. Ct. 276, 280 (1988) (delay of 13 months insufficient); *cf. Centcast Services, L.P. v. United States*, 729 F.3d 1352, 1363-64 (Fed. Cir. 2013) (plaintiff failed to raise its newly pleaded theory for over fifteen years after it was aware of the theory and seven years after it could have first raised the theory in response to a government counterclaim); *Rockwell Automation, Inc. v United States*, 70 Fed. Cl. 114, 122-23 (2006) (the Government's delay in seeking to add affirmative defenses was unwarranted when the facts giving rise to the defense resulted from a criminal investigation that closed fourteen years before leave was sought and the Government failed to either raise the defense during three years of discovery before the case was stayed or during the eight years after the case was stayed).

No such undue delay existed here.  When LW first filed its complaint in this case, the US Attorney's Office had already declined to intervene in what appeared to be a qui tam suit being brought by a disgruntled subcontractor seeking leverage to obtain a settlement in the separate district court case.  In addition, although LW had challenged the termination for default decision by filing its complaint, the case was stayed for almost a year by agreement of the parties to permit LW to file its claims with the VA in accordance with the Contract Disputes Act —claims that it could have filed in the years before it was terminated or before it filed suit and which would have avoided a year of delay, agreed to in order to prevent needless jurisdiction arguments.  By the time the VA issued its final decision to LW's September 15, 2015 claim, the qui tam case was dismissed.  After conferring with the US Attorney's Office in November 2015, we did not believe there was much evidence of fraud and initially concluded the fraud claims need not be pursued.  However, as discussed above, based largely on information that Government counsel acquired in late Spring of 2017, and interacting with the principals involved

during the deposition process, we concluded that LW was little more than a front for Brantley Construction, and we promptly sought authority to bring fraud counterclaims and defenses.

While it is true that LW was denied its SDVOSB status in October of 2011, LW does not explain how we could have brought fraud counterclaims or defenses in this case six years ago when LW did not even file its deficient complaint until 2014 or its amended complaint until December 2015.  Unlike a case where a party sat on its rights for fifteen years without excuse, *see Centcast*, 729 F.3d at 1363-64, there is no evidence of such an extreme or unjustified delay here.  Although the Government did not raise its fraud counterclaims or defenses when it first learned of the qui tam suit, any delay in this case does not warrant denial of our motion for leave. Instead, the interests of justice identified in Rule 15(a)(2) favor allowing this Court to determine whether or not LW's contract and subsequent claims are based on fraudulent representations.

In addition, LW seeks to inflate its delay argument by lumping in the decisions by the VA OIG and the U.S, Attorney's Office not to prosecute civil or criminal claims against LW. Effectively, LW argues that because the Government declined to prosecute LW for fraud that the Government should not be permitted to defend itself against a contractor's claims on the basis of fraud.  Such an argument would require the Government to pursue every fraud claim immediately, regardless of the amount of resources expended, or else loose the right to raise fraud as a defense in response to a future claim.  LW's argument also fails because it was not until we learned additional information during latter part of discovery that we determined that LW fraudulent obtained the Fort Jackson contract.  In any event, the investigations of VA OIG and the U.S. Attorney's Office all occurred within six years of the Government asserting its fraud counterclaims.

LW also suggests delay on the part of the terminating contracting officer, when the very emails it presents to support its argument demonstrate that Ms. Lam promptly referred LW to the VA OIG soon after she first became involved in the contract and without any knowledge that the contract was awarded based upon LW's fraudulent misrepresentations. *See* ECF No. 66-22; ECF No. 66-23. Although LW complains that it was still required to continue performance on the Fort Jackson project, LW did not inform the contracting officer that the contract was null. Instead it continued performance and sought to obtain payments thereunder.

LW next argues that it will be prejudiced by the introduction of the Government's fraud counterclaims and defenses because, it asserts, "discovery will essentially start over again." Pl. Resp. 16. LW cites to a number of examples where such prejudice might occur, including the introduction of complicated new legal theories shortly before trial, unfair surprise to the opposing party, and prevention of the non-movant from adequately responding to the claims. *Id.* However none of those examples apply in this case where there is no date scheduled for trial, and LW was put on notice through the Government's discovery requests and deposition questions that issues of fraud might be raised. Moreover, LW should be adequately prepared to defend the fraud allegations given that the allegations pertain to the actions of principal participants in this litigation, Louis White, Gary Brantley, and Sidney Brantley.

As we explained in our motion, our fraud claims focus on a narrow issue – whether LW fraudulently induced the award of the Fort Jackson National Cemetery contract – and all of the relevant facts concerning this issue are within LW's control. Although LW complains about the allegedly extensive amount of discovery and depositions required in order to demonstrate prejudice, most of the witnesses identified by LW are irrelevant to the question of whether LW committed fraud, and most of the relevant documents are in the possession and control of LW.

14

Had LW produced documents in response to our discovery requests eight months ago, there would be little information left to exchange. Furthermore, the mere addition of discovery alone does not rise to the level of undue prejudice to warrant denial of our motion. *See, e.g. Veridyne Corp. v. United States*, 86 Fed. Cl. 668, 681 (2009) ("The cost, even to plaintiff as a small business, and burden of undertaking additional discovery do not substantiate the level of prejudice needed to overcome the liberal standard of RCFC 15(a)(2)."). In addition, LW fails to articulate how it would be prejudiced by being forced to address the issue of fraudulent inducement beyond its complaint of increased "complexity." That its "legitimate" CDA claims might be overshadowed by its fraudulent acts is not a basis to deny our motion. Further, additional complexity necessarily arises every time a party seeks to amend a complaint (or answer), and such an argument, in and of itself, cannot possibly constitute a basis to deny a motion for leave to amend in light of the admonition in Rule 15 that leave to amend shall be "freely given" when justice so requires.

## II.    The Government's Fraud Defense and Counterclaims Are Facially Valid

### A.    The Statute Of Limitations Would Not Bar Our Fraud Defense or Counterclaims

LW argues that the Government's motion would be futile because our claims are all time barred based on 28 U.S.C. §§ 2415, 2501 or 31 U.S.C. § 3731(b), stemming from "the date that the government determined LW [] did not qualify for SDVOSB status." Pl. Resp. 18-19. Although LW asserts that all three statutes bar all of the Government's counterclaims, it limits its analysis of sections 2415 and 2501 to our common law fraud and unjust enrichment claims, and its section 3731 analysis to our FCA counterclaims. *Id.* at 18-21. LW cannot demonstrate that our claims are time-barred.

As an initial matter, LW asserts that the Government "determined LW [] did not qualify for SDVOSB status" in September 2011. Pl. Resp. 18-19. Based upon LW's own response however, that date is incorrect. A contractor for the VA conducted a site visit to LW in September 2011, but CVE did not issue its determination that LW was not an eligible SDVOSB until October 24, 2011. Moreover, LW sought reconsideration of this determination, and this was not denied until March 2012.

To address the merits of LW's statute of limitations argument, sections 2415 and 2501 of Title 28 of the United States Code must be read in conjunction. Section 2501 states that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Next, section 2415(a) explains that "every action for money damages brought by the United States . . . which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues." This six-year statute of limitations period is subject to the explicit language in section 2415(f), which states that "[t]he provisions of this section shall not prevent the assertion, in an action against the United States . . . of any claim of the United States . . . against an opposing party, a co-party, or a third party that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."

The Court of Appeals for the Federal Circuit recently addressed the interplay between sections 2415 and 2501 in *Strand v. United States*, No. 16-2450, 2017 U.S. App. LEXIS 17265 (Fed. Cir., Sept. 7, 2017). In holding that the Government's counterclaim seeking repayment of salary paid during the petitioner's civil confinement to be timely, the Federal Circuit explained that, although generally the six-year period to seek money damages under a contract applied to the Government, that six-year period "does not prevent the government from asserting its claim

16

as a counterclaim that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." 2017 U.S. App. LEXIS 17265, *10. Because the petitioner filed a claim "seeking an entitlement to the wages paid to him between his civil confinement and separation from the Navy," and the Government's counterclaim sought "recovery of those same wages," the Government's counterclaim was timely pursuant to section 2415(f). *Id.* at *11.

As with the counterclaims brought in *Strand*, the Government's counterclaims here arise out of the same transaction and occurrence: LW seeks to recover under its contract with the Government, and the Government asserts that same contract was void *ab initio* and that any such recovery is impossible. This Court's analysis of the Government's rescission counterclaim in *American Heritage Bancorp v. United States*, 56 Fed. Cl. 596, 607 (2003), is analogous to the current circumstance:

> [i]n effect, the government is arguing that because the contract between AHB and the government is void, it never existed and thus could not have been breached and given rise to a right to damage. The court agrees. The government could not waive its right to rescind the contract, because if the government can prove fraudulent inducement, the contract was rescinded as a matter of law. The government's rescission counterclaim is nothing more than an assertion of that legal fact.

*Am. Heritage,* 56 Fed. Cl. at 607.

Indeed, especially with respect to fraud counterclaims and defenses, this Court has held that adhering to the six-year statute of limitations period "'would greatly restrict this important defense designed to protect the government from fraudulent claims.'" *Am. Heritage,* 56 Fed. Cl. at 606 (relating to Special Plea in Frauds counterclaim and applying the same analysis to rescission counterclaim) (quoting *First Fed. Sav. Bank of Hegewisch v. United States,* 52 Fed. Cl. 774, 787-88 (2002)); *see also Erie Basin Metal Prods., Inc. v. United States,* 150 F.Supp. 561, 566 (Ct. Cl. 1957) ("There is no limit of time within which the Government must bring a

17

common law action of fraud."); *Jana Inc. v. United States,* 34 Fed. Cl. 447, 451-52 (1995)

("Common law causes of action, . . . are not governed by the six-year statute of limitations on

claims by the government arising from a contract, if they arise from the 'same transaction or

occurrence that is the subject matter of the opposing party's claim [against the United States].")

(citation omitted).

LW asserts that the Government "knew or reasonably should have known of the existence of

any [FCA] claim based upon" the fact that LW was not an eligible SDVOSB in September 2011,

and because we filed more than three years after that time, our claims are barred.  Pl. Resp. 20-

21.  But LW misconstrues the FCA statute of limitations, which, at a minimum, permits the

United States to assert claims going back six years, which in this case would be October 13,

2011.

Section 3731(b) states that an FCA claim is barred by the statute of limitations if it is brought

the later of (1) more than six years after the date on which the violation of section 3729 is

committed or (2) more than three years "after the date when facts material to the right of action

are known or reasonably should have been known by the official of the United States charged

with responsibility to act in the circumstances."  31 U.S.C. § 3731(b).  LW's argument thus

hinges on the assertion that only date relevant to the statute of limitations inquiry as in

September 2011, when the VA determined that LW "was not an eligible SDVOSB."  Resp. 20;

*see also supra* at 16.  But LW misunderstands the law: each claim for payment by LW to the

Government is its own FCA claim with a separate statute of limitations inquiry.  *Veridyne*, 758

F.3d at 1378-80.  The Federal Circuit explained this concept in *Veridyne Corp. v. United States,*

758 F.3d 1371, 1378-80 (Fed. Cir. 2014), when it upheld this Court's award of penalties based

on 127 separate false claims.  As explained by the appeals court, each invoice submitted pursuant

18

to the contract modification, that had misrepresented the cost of Veridyne's services, was a separate FCA claim. *Id.*; *see* 31 U.S.C. § 3729; *see also United States v. Anchor Mortg. Corp.*, 711 F.3d 745, 748 (7th Cir. 2013) (holding that section 3729(a) "refers to 'the violation'; each must be assessed separately."); *Brown v. United States*, 207 Ct. Cl. 768, 789 (1975) ("[E]ach purchase order must be regarded as a separate claim for purposes of defendant's [FCA] counterclaim.") (analysis under the prior version of the FCA). The Federal Circuit further elucidated that "claims submitted pursuant to a fraudulently obtained contract are FCA violations even if the claims themselves do not contain false statements." *Id.* (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943) (s*uperseded by statute on other grounds as recognized by Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1893-94 (2011)). Consequently, the statute of limitations inquiry before this Court is not simply whether the Government filed its FCA counterclaims within three years of when it "knew" that LW was not an SDVSOB, but rather whether each invoice or claim submitted by LW against the fraudulently-obtained contract awarded in June 2009 meets the time limitations set forth in section 3731, *i.e.* the latter of either six years after the date of the submission or three years after the date on which the Government knew of the falsity.

As a result, LW cannot establish that *all* of the Government's FCA claims are time-barred. LW submitted invoices for payment on 22 occasions between 2009 and 2012, each of which is a separate false claim. The statute of limitations period for each of these invoices is six years after the date of the fraudulent submissions, thus, at the very least, all 4 invoices for payment made to LW on or after October 13, 2011 are within the statute of limitations. 31 U.S.C. § 3731(b)(1). Moreover, the three additional claims LW filed in this case—on February 17, 2015, September

15, 2015, and September 24, 2015—each represent separate FCA violations. These FCA

violations are clearly not time-barred even under LW's flawed interpretation of section 3731(b).

> ### B. LW's Fraudulent Representations As To Its SDVOSB Eligibility
> ### Are Clearly Material To Claims For Payment Under That Contract

LW next argues that the Government "cannot establish that any alleged misrepresentations

by LW were material," Pl. Resp. 21, and points to the VA's payments to it after CVE denied LW

SDVOSB status for future contracts as well, as to the additional work the VA directed LW to

perform, as evidence of the immaterial nature of its representations to the VA. *Id.* at 22-24. LW

reliance on the Supreme Court's holding in *Universal Health Servs., Inc. v. United States ex rel.*

*Escobar (Escobar)*, 136 S. Ct. 1989 (2016), to support its materiality argument is misplaced. *See*

Pl. Resp. at 21-25.

In *Escobar*, the Supreme Court examined materiality in the context of an "implied false

certification" theory under the FCA in the Medicaid context. 136 S. Ct. at 1996-97. In short, the

complaint at issue in *Escobar* alleged that a medical facility "submitted reimbursement claims

that made representations about the specific services provided by specific types of professionals,

but that failed to disclose serious violations of regulations pertaining to staff qualifications and

licensing requirements for these services," including types of clinicians, licensing requirements,

and supervision requirements. *Id.* at 1997-98. In determining whether the defendants' requests

for Medicaid reimbursement contained implied false certifications that might be actionable under

the FCA, the Supreme Court provided guidance to lower courts on whether a false certification

of compliance with a regulation or contractual terms could be considered material to the

Government's payment decisions. *Id.* at 2001-04.[5]

---

[5] The Court of Appeals for the Federal Circuit has not yet addressed the materiality analysis
in *Escobar*.

The *Escobar* Court began with the FCA's statutory definition of materiality—"having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4)—and stressed that this was the same definition employed in "other federal fraud statutes," which came from "common-law antecedents." *Id.* The Court noted that the basic concept of materiality is the same in all of these contexts, focusing upon "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)). Citing tort and contracts principles, the Court explained that a matter is material if: (1) a reasonable person would attach importance to it in determining a choice of action in the transaction, or (2) the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, regardless whether a reasonable person would do so. 136 S. Ct. at 2002-03 (citing Restatement (Second) of Torts § 538, at 80; Restatement (Second) of Contracts § 162(2), and Comment c, at 439, 441).

The Court made clear that this inquiry is holistic and must take a variety of factors into account. *See* 136 S. Ct. at 2001 (noting that "materiality cannot rest on 'a single fact or occurrence as always determinative' " (citation omitted)). One relevant factor is "the Government's decision to expressly identify a provision as a condition of payment," which the Court viewed as "relevant, but not automatically dispositive." 136 S. Ct. at 2003. Other factors include whether the violation is significant or "minor or insubstantial," *id.*, whether the violation goes to the "essence of the bargain," *id.* at 2003 n.5 (citation omitted), and what actions the Government took in this or other cases where the Government had "actual knowledge" of similar violations, *id.* at 2003-04. Taken together, these factors establish that the materiality of a

defendant's non-compliance with a statutory, regulatory, or contractual requirement ultimately depends upon the capacity of the violation to affect the government decision-maker.

Although the "materiality standard is demanding," *Escobar*, 136 S. Ct. at 2003, the standard is clearly met in this case. Applying the guidance in *Escobar*, no reasonable person would conclude that the contracting officers would **not** attach importance to a misrepresentation regarding LW's eligibility for contracts expressly and exclusively reserved for SDVOSBs. The VA restricted competition for the Fort Jackson contract to only eligible SDVOSBs consistent with the congressional direction contained in the Veterans Benefits Ac of 2006; even if a contractor could meet all of the other requirements to be eligible for the contract, it was still required to meet the statutory and regulatory criteria to be an SDVOSB in order to obtain the contract. Congress manifested its clear intent that misrepresentations regarding SDVOSB eligibility are material, establishing that misrepresentation of a firm's status as an SDV-owned firm "shall be subject to" civil prosecution under the FCA. 15 U.S.C. §§ 637(m)(5), 657f(d); *see also* 13 C.F.R. § 125.32(e) (penalties for misrepresenting an SDVOSB status include criminal penalties, civil penalties under the FCA, and suspension or debarment). Indeed, Congress has established a "presumption of loss to the United States based on the total amount expended on the contract … whenever it is established that [a non-small business] willfully sought and received [a set-aside] award by misrepresentation." 15 U.S.C. § 632(w)(1); *see also* 13 C.F.R. § 125.32(a) (similar).[6]

---

[6] Similarly, the Federal Circuit has long held that contracting officers are not permitted to waive small business award criteria, such that a misrepresentation of small business status renders a contract void *ab initio*. *See J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200 (Fed. Cir. 1988).

Although "materiality … cannot be found where noncompliance is minor or insubstantial," *Escobar*, 136 S. Ct. at 2003, LW's eligibility as an SDVOSB was -- undeniably -- essential to the award of the set-aside contract.  Underscoring this point, *Escobar* cited as an example of a material misrepresentation a case in which the "contractors' misrepresentation that they satisfied a non-collusive bidding requirement for federal program contracts violated the False Claims Act because '[t]he government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive.'"  136 S. Ct. at 2003 (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)).  And the Court observed that an "an undisclosed fact was material because '[n]o one can say with reason that the plaintiff would have signed this contract if informed of the likelihood' of the undisclosed fact."  136 S. Ct. at 2003 (quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400, 178 N.E. 672, 674).  So too, in the instant case, "the government's money would never have been [obligated towards the contract] had it known" that LW was not an eligible SDVOSB when it bid on the contract and "no one can say with reason that the [Government] would have signed this contract if informed … of the undisclosed fact" that LW was not SDV-eligible.  *See id.*  LW's myopic focus on payments under the contract ignores the multi-factor analysis mandated by *Escobar*.

Further, LW's materiality argument, like its statute of limitations argument, hinges solely on the VA's revocation of its SDVOSB status in October 2011.  But, the materiality question is not whether the VA believed that LW was no longer an SDVOSB when it revoked LW's CVE status.  Rather, the question is whether LW's assertions that it was an SDVOSB, upon which the VA relied when making the contract award, were material to the award of that contract.  Unlike the various regulations that were at issue in *Escobar*, LW's contract award was predicated upon

its false representation that it was a legitimate SDVOSB.  Payment under the contract was predicated upon LW's eligibility to obtain the contract in the first place.

Although LW argues that the VA's continued payment demonstrates that the SDVOSB requirement was not material, the evidence it cites contradict its assertions.  Just as LW argues that "[o]nce an award is made, the contractor is entitled to continue performance and receive payment even if its status changes during contract performance," Pl. Resp. 14, the emails LW cites show that the contracting staff similarly understood that a subsequent change in status alone did not permit the termination of the contract.  *See id.* at Exs. 22, 23.  But this mistaken view does not save LW.

Furthermore, the contracting officer referred LW to the VA OIG because she did not believe an SDVOSB was performing 15 percent of contract work as required by the contract.  Ex. 07 at ¶ 4.  Had she known that LW obtained the contract through fraud, she would have terminated the contract.  *Id.* at 5.  However, she did not receive any information from the VA OIG, despite requesting that information just prior to the termination.  *Id.* at 4.  Therefore, the VA did not continue to pay LW under the contract with "actual knowledge" that LW did not meet SDVOSB eligibility criteria as required by *Escobar* to even raise a question about materiality.  *See* 136 S. Ct. at 2003.

III.    Seeking To Prevent Payment Pursuant To A Contract Obtained By Fraud
        Is Not An Improper Purpose For Requesting Leave To Amend Our Answer

Finally, LW's assertion that the motion for leave is being proffered by the Government for an improper purpose, or in bad faith, is without basis.  The Government's purpose for filing the motion for leave is to ensure that a contractor—that is now 98 percent owned by Sidney Brantley, that appears to have been improperly formed for the purpose of obtaining the SDVOSB contract at issue, that misrepresented its status as an SDVOSB in order to win a $10 million

contract, and that failed to even complete a contract it fraudulently obtained—cannot further profit from that fraudulent behaivor.  The notion that the intent of the motion is to delay trial is absurd, given that there is no currently scheduled trial date.  Far from seeking a delay in order to gain a negotiating advantage over LW, the Government filed its motion in the hope that LW would receive no more ill-gotten gains from its abuse of the SDVOSB set-aside program.

<u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court grant defendant leave to file our amended answer asserting the affirmative defense of common law fraud and a fraud counterclaim pursuant to the FCA.

Respectfully submitted,

CHAD R. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

s/ Jeffrey M. Lowry
JEFFREY M. LOWRY
Trial Attorney
ERIN K. MURDOCK-PARK
Trial Attorney
Commercial Litigation Branch
Civil Division
OF COUNSEL:                          U.S. Department of Justice
P.O. Box 480
EYVONNE MALLET                       Ben Franklin Station
Attorney                             Washington, DC 20044
Office of General Counsel            Telephone: (202) 616-3753
Department of Veterans Affairs       Facsimile: (202) 514-8624

*Attorneys for Defendant*

December 20, 2017

25